Good morning, your honors. My name is Jack Gaughan and I'm here on behalf of Appellant David Wood. To judge by the absence of points, the absence of civil liability arising from traffic infractions, to judge by driving convictions, Mr. Wood was a safe driver for many years when the Motor Vehicle Administration of Maryland refused to renew his license based on a statute barring licensure for applicants with less than 110 degrees of peripheral vision. Mr. Wood had 60 degrees. Mr. Wood's restricted peripheral vision is a disability, the meaning of the Americans with Disabilities Act and the grounds that the Maryland statute thereby discriminated against him for his disability in a way that violated these federal laws. In a motion to dismiss, the state contended that since 110 degrees was a legal qualification for an operator's license, Mr. Wood was not qualified or otherwise qualified within the meaning of these laws and thus could not state a claim. The district court agreed, which is one of the two reasons that it granted the motion to dismiss. However, the state cannot be the party to make the final determination for purpose of the Americans with Disabilities Act and the Rehabilitation Act of what constitutes a qualification for a state benefit or program. Why did the district court get it wrong in relying on DOJ guidance about essential eligibility requirements? The DOJ guidance, I guess Your Honor is asking about the Federal Motor Carrier Safety The Technical Assistance Manual, the language that may consider factors related to the disability in determining whether an individual is qualified in the first instance. Your Honor, I don't believe that the Technical Assistance Manual was complied with in this issue and I don't know that the court devoted a great deal of attention to that question. I'm sorry, Your Honor. It appears that the court ignored the criteria that accompanied the direct threat analysis, which is that it must be based upon the latest medical science and must be as a individualized assessment unless certain conditions are met for proceeding by a general rule. As the Pandizita's case stated, any other arrangement will allow a state to articulate arbitrary requirements that would nevertheless withstand review under the ADA and the Rehabilitation Act. It would render those federal statutes toothless, in effect, against any state that had mandated discrimination against the disabled in a rule captioned qualifications. A state like the District Court has failed to respond to citations of Pandizita's, but that case does articulate the law in the circuit. What do you do about Ward versus Skinner? Say again? What do you do about Ward versus Skinner? Well, that case is under the Federal Motor Carrier Safety regulations and there are numerous ways to deal with that. To begin with, it's, I believe, clear that the Federal Motor Carrier Safety rules are not subject to the Americans with Disabilities Act. 49 U.S. Code 31-136 makes them predominate and there's language in the Albertson Supreme Court case that makes it clear that those regulations are not subject to the ADA. There is case law as well that says that it's not subject to the Rehabilitation Act. One case, and I apologize that I did not have this in the briefs, Buck versus U.S. Department of Transportation, 56 F. 3rd, 1406, a D.C. circuit case says as much. I believe that's a reasonable interpretation of the Technical Assistance Manual as well. Setting aside that question, it is undoubtedly the case that the Ward court did proceed under the assumption that the Rehabilitation Act did apply. And to the extent, by the way, that I've represented to this court, the court in Ward said that it knew that it didn't. I apologize. I was confusing it with another case. But in any case, Ward did act as if the Rehabilitation Act did apply. But it did so using criteria that I think are inimical to a proper analysis under the Rehabilitation Act. It gave three cumulative criteria, which I think amount to something akin to administrative deference. It says that the agency must have, quote, behaved reasonably, and a more individualized inquiry would impose significant additional burdens on the agency, and that Congress had expressed some kind of approval of the rule. Now here, the peripheral vision standard does not, it seems, measure up to current knowledge. In the light of current knowledge, it cannot be said that the standard is reasonable. And the National Highway Transportation Safety document that the state itself cited effectively says as much. And since it seems to be conceded in that, and there's very limited literature suggesting a higher degree of dangerousness for drivers with restricted peripheral vision, and recommending that they be individually tested, I don't think reasonable standard is met here. Additional burdens, if you look at the source of the Ward Court's analysis of that, it says they must be additional administrative and financial burdens that Congress could not have contemplated. What specific relief would you like granted here? Your Honor, obviously Mr. Ward would, sorry, Mr. Wood would be most pleased to receive the license forthwith. However, there is little doubt that under the precedent under both the ADA and the Rehabilitation Act, courts will not typically refuse the right of the motor vehicle administrators to engage in additional testing when they believe they have cause for concern. We need to do that in this case because he suffers from degenerative eye disease. He was able to pass the test the last time, based on the evidence that he has, and a driver's license issuance is based on your ability to drive in the future, not the past. Well, Your Honor, you're assuming what is to be proved, that he cannot drive in the present. Did you offer evidence that he can drive in the future? Well, this case got no further than a motion to dismiss, but I believe that the three criteria that I cited at the outset of my argument here constitute adequate allegations that he is a safe driver in the present, or at least as of the moment that he was denied the ability to continue to drive. Mr. Golden, I understand your argument. It's one thing, you know, there's some impact, but here's a question. Your client is a good driver, proven by no offenses, doing well, right? Obviously, a person can compensate for diminishing a peripheral vision by obviously they have to look more that way, right? I have a question, I'm just sort of setting the stage for the question. The question is this, looking forward at the roadway, probably most intersections, it's probably about 30%, maybe? So you're saying that if he went down to maybe 30%, as long as he could say, I can compensate by looking hard left, hard right, and not have an accident, then that would control, but not visual acuity, a numerical visual acuity? Well, this is not an acuity issue, this is a peripheral vision issue. Well, it's the same thing. Typically those standards are regarded as separate categories. Okay, well, separate or not, it's based on objective standard ability to see. Correct. And you're telling me, my question is this, if he went down to 30%, you're saying as long as your client could say, hey, I can do it, I compensate by looking real hard left until I get everything I need to see into my zone, then he could drive? I think the answer to the question is yes, but I would say that it's really not a matter for either of us using our common sense here. It is a matter for medical science to determine. I don't understand the means by which compensation occurs. And honestly, I'm not sure, and I don't know that Your Honor would be either. It is something that should, however, be looked at, particularly in view of the inconclusive science that's cited in that NHTSA document that was cited by the MVA. The district court found individualized consideration unnecessary relying on the Title II technical assistance manual, says plaintiff alleges that the requirement is outdated but presents no allegation in support of this averment. You take issue with that? I take issue with the implicit assumption of the, well, first of all, no, the answer is that Mr. Wood did allege everything that he was required to allege. In support of the averment that the requirement is outdated? Mr. Wood was not required to make that averment in the first place. Yes, he was. The analysis proceeds in two parts. First, you have to be a qualified individual. You can't get to the accommodation piece just yet. So given that a public entity can establish requirements, such as vision requirements that would exclude some individuals with disabilities if they're essential for the safe operation of a motor vehicle, the Maryland statute establishes such a requirement. And incidentally, the Maryland statute has decreased the, has it not, the field of vision requirement from 140 degrees to 110 degrees. Your Honor. There has been movement in the direction of limiting the field of vision requirement. Your Honor, I'm sorry. What is at issue about whether or not, what has the plaintiff put forward to support an allegation that the requirement, which appears to satisfy the technical assistance manual, is outdated? All right. There are lots of things to say, unfortunately, and I'm going to trench on my time, I'm afraid. I didn't mean to do that. I'm sorry. Okay. First of all, it is not a pleading requirement. It is very clear what one needs to allege in a circumstance like this in order to produce a facially correct allegation under the ADA and the Rehabilitation Act. That's been cited in the briefs. And that was accomplished. Doesn't he have to show that he's a qualified individual? He has to allege that he is a qualified individual. But the innovative health case cited in the brief will set forth what are the pleading requirements under those statutes. Second, the issue of the outdatedness of the statute has to do with an affirmative defense. It is the state's pleading burden. We don't have to allege the opposite in a complaint. We're running into a problem, I think, because I don't see how we've gotten to the affirmative defense stage yet. We didn't because they moved to dismiss before answering the complaint. There was no burden for us to allege the opposite of an affirmative defense in the initial complaint. And that's where we were when the judge put a halt to the case. So you don't think eligibility requirements have to be alleged to be met because the essential eligibility requirement is the field of vision requirement. There's no suggestion that he does not meet that. You do not allege that he meets that. Well, I believe we do allege that a safe driving is the essential eligibility requirement. And that was alleged, Your Honor. No, that's incorrect. That's what in this context the essential eligibility consists of, is the ability to drive safely. No, it has to establish vision requirements that would exclude some individuals if they are essential for safe operation of a motor vehicle. Those are the essential requirements. Your Honor, I believe I've said all I can say in response to that point. I will add that the complaint did allege that the standards set forth in the statute were 20 years old. They are now 21 years old. And I think that in and of itself, given what we know about the explosion of safety, does not indicate that they are outdated. And I think that that complaint, as the Innovative Health case says, meets the pleading requirements for the Rehabilitation Act and the Americans with Disabilities Act. My time, I see, is up. Thank you. Thank you. Mr. Collins. Thank you, Your Honor. May it please the Court. Lake Collins on behalf of the Maryland Department of Transportation and the Motor Vehicle Administration with me today is my co-counsel, Eel Jacobs, Assistant Attorney General for Maryland. This case was properly dismissed by the district court because the plaintiff attacked the statutory standard for eligibility for driving, which is a safety standard. And that does not present a claim under the Americans with Disabilities Act. Further, in his complaint, he failed to allege or ask for an accommodation. And that is for the simple and unfortunate fact there can be no accommodation for a field of vision under today's medical science and technology. Mr. Wood is limited to his field of vision, and that can't be corrected. There is no current technology which would allow him to operate safely that would expand his field of vision. And for that reason, the district court was correct to dismiss the complaint, particularly under the Department of Justice guidelines, because Maryland has indeed set forth the Maryland legislature, not the Motor Vehicle Administration by regulation, but the legislature itself has created a reasonable safety standard by enacting the 140-degree field of vision. And with an exception for persons with restrictions who may drive with a 110-degree field of vision. Now, Mr. Wood. What causes that to come into play? I'm sorry, the reduction from 140 to 110? It allows a person with a field of vision between 140 degrees and 110 degrees to apply for a license. They are not tested. There is no testing criteria, but they have certain restrictions, which by statute is the side mirrors restriction, which I think under current manufacturing practices, all vehicles have dual side mirrors. Has that always been the case? Has it always been the case that between 110 and 140, you could obtain a restricted license? No, that's not true. In 1971, the field of vision requirement was established in Maryland, and in 1997, the legislature amended the statute to allow for the. . . To allow that range within which a person may obtain a restricted license? Yes, that's correct. What if I told you that I believe the district court erred on the direct threat analysis, and if we held that, would the court have otherwise been correct in dismissing the complaint? Well, yes, for another reason. Of course, the state would respectfully disagree with Your Honor about the direct threat analysis, but also as. . . That's a hypothetical. Thank you, Your Honor. But as also addressed in the brief, federal regulations under the Americans with Disabilities Act indicate that a fundamental change should not. . . The state should not be forced to make a fundamental change, and this would fundamentally affect many persons. . . The state in administering the vehicle laws to many persons with limited field of vision, an unsafe field of vision. There was a difficulty both in testing those individuals, because I don't think it would be proper for the state to ask its employees to road test those individuals. And the MVA, Motor Vehicle Administration, has testing for reaction time, that is simulation testing for reaction time, but there's no testing available for the risks of field of vision. So that would fundamentally alter the MVA's driver licensing program. It would take a fundamental safety regulation away from the state. I think it would render drivers less safe on Maryland highways. And in addition to Maryland, each state in this circuit has a field of vision requirement, and 40 states throughout the United States have field of vision requirements. So you say the burden on the DMV would be too great, and therefore Mr. Wood would not be entitled to individualized assessment. The state could rely on the general concept of field of vision. Yes, even under that CFR regulation about fundamental changes to a state program. What would an individualized assessment look like if there was one for someone with 60% peripheral vision? What would it look like? Well, that's part of the rub, Your Honor, because there is no ‑‑ there's limited testing for a person with limited field of vision. As I said, I don't think the state really can require its employees to road test, at least in traffic, and perhaps even on a course. A course, a driving course, a driving instruction course or driving testing course, would unlikely to be able to recreate the risk that a driver with a limited field of vision would encounter on a highway. And I don't believe it's safe for an individual to be highway tested when the limitation of the vision inherently creates risk that the state doesn't want to expose other drivers and pedestrians to. There is no testing process to test a person's ability to react to field of vision changes and that the field testing, a driving test, would just expose the driver and the public and the test administrator to those dangers. And by the same token, I think that, again, if we jump up to the ward analysis, the state of Maryland was reasonable in enacting this safety measure. It was done with, in consultation with, from legislative history we added, it was done with consultation with medical professionals and motor vehicle administration officials that was directed by the legislature. It was accomplished and it was found that, and in the legislative history which is not on the record, is also there were references to the Americans with Disabilities Act. So the legislature and its work group at that time were cognizant of expanding license opportunities for persons who could drive safely. They reached that 110 degree minimum proficiency for field of vision and that was reasonable and that should be respected by the courts and the plaintiff shouldn't be able to litigate against that legislative standard simply because he's unhappy with it and sort of speculatively claims that the standard is old or that research, there should be new research even though there is none. I mean, granted NHTSA declares that a limited field of division creates an increased crash risk and I think that's clear. NHTSA also said that more research is necessary, but perhaps that this case might survive the motion to dismiss if Mr. Wood had cited that research. But it doesn't exist. We are left essentially in the same position that the legislature was in 1997 when it appears that 140 degree standard is a good mark for drivers generally and particularly has always been the Federal Motor Carrier Safety Act standard for commercial drivers and has never changed and that the reasonable accommodation, so to speak, to 110 degrees with restrictions was made by the state and that is consistent with both the DOJ guidelines and the original intent of the Americans with Disabilities Act. The congressional record indicates that Congress was really more concerned with making sure that individuals who were unable to drive and couldn't obtain licenses would not be discriminated against just simply because they couldn't obtain a license. Congress essentially deferred to the Federal, the FMCSA, in regard to safety standards because they believed the FMCSA could appropriately arrive at those standards and really Maryland standards are consistent with the FMCSA and for that reason I think Judge Motz was compelled to uphold, dismiss the case because he felt Maryland statutory standard was fully lawful and really couldn't be litigated against by the plaintiff. In regard to the plaintiff's allegations, he simply, the allegations are simply that he has the opinion he can drive safely and that's not evidence he can drive safely. As Your Honor pointed out, his history is not so, Your Honor's pointed out, his history is not so relevant in the past as it is in his current fitness to drive because we're not concerned with his propensity to follow the vehicle laws or his propensity to drive safely. It's really whether he has the ability to drive safely. And so those allegations about his history are insufficient. So in light of those, the failure of his allegations, the failure of his complaint or his response to the motion to dismiss to support his assertion that this is an old standard, that current medical knowledge should obviate, then he has failed to respond to the motion to dismiss and the district court was correct to dismiss the case. If you have no further questions, I'll conclude my argument. I'll take the argument. Thank you. Thank you, Your Honor. Mr. Stone? Your Honors, I would just like to call your attention to what I was referring to before as to the standard of pleading in this case. The Innovative Health Systems case, which has been cited to the court, 931F, SEP 222 at 238. And I will not burden the court with reading it out, but I can tell you that the requirements set forth there are well known and they do not include anticipating affirmative defenses. Your Honors, as far as a fundamental alteration goes, raised by counsel, a fundamental alteration I think is more than simply changing one aspect of a program where the program happens to offend against a federal law that preempts it. Here, so far as one can tell, the only alteration of the program would be that potentially qualified drivers would be given the opportunity to show that they are actually qualified. That does not in any way trench on the twin objectives of the program as indicated in the preamble to the bill that instituted these standards, which are to increase access to individuals with disabilities and to maintain public safety. As far as individualized assessment goes, there may not yet exist in the toolkit, shall we say, of the Motor Vehicle Administration driving examiners a particular test directed at peripheral vision, but I doubt seriously that they cannot devise one. And as far as consultation with medical officials and others, and I stress and others, there are a lot of non-medical people, as indicated, who were consulted in that and the legislature relied upon. There is no indication in the record what medical information they were relying upon. There's no citations to studies. There's no discussion of alternatives. There is nothing there but a statement that we have changed the standard. That's it. What medical information are you talking about? This is the bill file that was adduced by the state in support of its motion to dismiss. The medical prognosis is not favorable for your client. Is that undisputed, correct? It is absolutely unestablished that the medical prognosis is that he will be in any way different a year from now or ten years from now. So you disagree with the prognosis? There is no prognosis in the record, Your Honor. Okay. It's not in the record. It's not in the record. And so far as I know, it's not established by medical science. Do you dispute that 60% or so is his range? Do you dispute that? I'm sorry, Your Honor. Do you dispute that what his range is for peripheral division? It's 60 degrees. Yeah. Do you dispute that? No. All right. There's no dispute about that. So what medical evidence is someone going to come up medically and say that that makes you qualify for 60%? Well, what are you looking for? Your Honor, what I'm looking for is some indication that he would thereby flaunt the four tests that are attributed or, sorry, that are set forth in the technical assistance manual. The imminence of danger, the degree of threat that he poses, and the other two that are mentioned in there. There's no correlation drawn as yet. There is a generalized fear that people with such restrictions may be more dangerous drivers, but there's very little hard evidence out there that they are. And we think that Mr. Wood should be given the opportunity. That evidence wouldn't come from medicine. It would come from people who are engineers in terms of traffic. There's no ophthalmologist that's going to be able to say, well, you know, I think that people with that can do this. No, that's not the question. The question is people who are experts in terms of traffic engineering, in terms of driving experts, and they've consulted teams of people, and they've come up with something. And, again, it seems to me your argument is that if his peripheral vision went down to 25%, you would be arguing, oh, we have to wait until some medical evidence to say that it's dangerous, as long as he doesn't have an accident. Am I correct? What difference would it make? And this is a hypothetical. If it was 25%, how would your argument be any different than it is today? Your Honor, I think that until we know more medicine and engineering both, I don't think it's possible to say. But I can tell you that if there are any studies out there that the MVA can reasonably rely upon, you aren't going to have us up here arguing. Meantime, though, as Your Honor observed in the previous case, driving is really important to people. What I'm having trouble with, and I think maybe this is what perhaps, and I don't want to assume what Judge Gregory might be getting at, is you seem to feel that all you have to do is allege that your client is perfectly capable of driving safely and that it's the burden of the state to do more than simply allege once the state has put a fairly hefty weight on the state to document empirical support for its position on the table. I think that in terms of the technical requirements of pleading, the answer is yes, all you have to do is allege with some supporting detail, and there was, in order to pass a motion to dismiss. Would that be the end of the case? Of course not. But we never got there. We got knocked out at the motion to dismiss. Surely this would end up being a battle of experts at some point, and there would be, without a doubt, reference to the Federal Motor Carrier Standards as an example. There would undoubtedly be. In addition, however, some attempt to determine whether a 21-year-old standard still has validity in light of what is now known. And all of this was foreclosed, and Mr. Wood's very important ability to drive was cut off simply because the judge felt that there was not enough alleged. But I don't think, Your Honor, in light of what is set forth in that case that there's any question that the technical requirements of alleging an affirmative case of violation of the ADA and the Rehabilitation Act were met. And this is very important. Thank you very much, Your Honors. Thank you, Counsel. We'll come down, Counsel, and proceed to the next case.
judges: Roger L. Gregory, Allyson K. Duncan, Henry F. Floyd